Good afternoon. May it please the court. My name is Betsy Shepard for the appellant, Alan Collie. The main issue that we're here to talk about today is whether or not Mr. Collie has any severe impairments. Now the agency, the ALJ, found that Mr. Collie has multiple medically determinable impairments, and those include a history of meningeal encephalitis and associated cognitive disorder, depression, chronic insomnia. Yeah, I mean, I thought that there was a debate among the medical people whether he had meningitis. Your Honor, that was a bit of a debate. There was one bacterial test that was positive, I believe, but they were never able to determine with 100% certainty whether he had meningitis or not. But did the ALJ find it? I thought the bacterial test was negative. I wasn't aware of a different, I thought the test was negative and it was just inconclusive because they couldn't rule it out. That may have been the case. It was my understanding that there were three different bacterial tests and one was positive and the other two were negative and that was why they weren't sure exactly what he had, but the bottom line is that the ALJ found that he did have a history of meningeal encephalitis, so there was swelling in his brain. They weren't sure if it was caused by meningitis specifically or not, but that was one of the medically determinable impairments that the ALJ found. Now, do you agree that it was, does that mean that he had a symptom that, he had the symptom, but whether it was caused by a viral disease, we don't know. Is that basically what you're saying? That's basically correct. Do you agree that there's a dispute between the medical experts on the severity of any impairment? I understand his true, Dr. Castleman and Dr., I don't know how to pronounce the first doctor's name, Kunte, is treating doctors. The two of them offered opinions of impairments, severe impairment or inability to do certain work things, but that there were five doctors who evaluated him or examined him and said no, his impairments are not severe. I mean, are those the seven opinions that are in play here? Okay, well, to answer that question, there are two treating doctors who treated Mr. Kali and then there are four opinions from the or had any contact with Mr. Kali at all. Their job was to review the record on behalf of Social Security. And the fifth opinion was that of an examining psychologist. So I understand your argument in the district court was that because they're not treating physicians or examining physicians, that's not enough to create a dispute between the experts. That essentially we should discount their opinions, but just assume I don't accept that. Is it, are those seven doctors, the seven that we're talking about, the two treaters and then the other five? Yes, your honor. Those are the seven opinions that we're dealing with here. What is the standard for, it's very rare that we get cases regarding step two. So is the standard for assessing medical evidence the same as step two as it is where we were usually focused on step five and occasionally step four? Well, the issue at step two kind of has two parts to it. The first part is whether or not medically determinable impairments exist, which here the ALJ found that they did. And the second part is whether those impairments cause any work-related limitations. So the main issue in this case is that we have two treating doctors that claim it's own testimony. What is a severe impairment and how strong does it have to be proven? The briefs are not, don't address this question. Well, an impairment is considered severe under regulations that significantly limits an individual's ability to... It has no more than a minimal effect on, it's not severe, but it has no more than a minimal effect on an individual's ability to work. Is that accurate? That's accurate. That's a little different than a significant effect, I guess. And then it's the standard for the medical evidence. It has to be clearly established by medical evidence that it's not severe. In other words, is it sort of opposite of what it usually is? What usually meaning four and five, which is where we usually, cases we usually hear? Well, what it comes down to when you're talking about step two is whether it causes limitations. So what we have to, the ALJ has to do is weigh the medical evidence and determine which opinions, because you have two treating doctors here who are saying that these impairments do cause significant limitations in his ability to work, but they've reviewed the record and they all... Doesn't that ask us, doesn't that argument ask us to reweigh the evidence? In other words, there's a dispute between these medical experts and the ALJ discounted the treating physician's reasons set out in her decision. And when you start arguing the weight of the opinions, I mean, I think the issue is, did the ALJ have, is that decision supported by substantial evidence in other, did she articulate clear and coherent reasons why she discounted those opinions as opposed to we should now reweigh the medical testimony? Do you agree that we cannot reweigh the medical testimony at this point? Well, I agree that the court cannot reweigh the medical testimony. I don't believe that that's what we're asking the court to do. The case law in the Ninth Circuit says that if the ALJ is going to reject medical opinions from a treating doctor, then the ALJ needs to provide clear and convincing reasons. And if those opinions are contradicted by another doctor, which there's some debate that they are here by the non-examiners, then the ALJ still has to give specific and legitimate reasons. And it's our position that the ALJ did not provide even specific and legitimate reasons. It may have been somewhat specific. Okay, so she included all the parts in the record where Mr. Cawley had consistently normal findings and noted that that was inconsistent with the recommendations based on their own notes. She discounted his symptom testimony because it wasn't consistent with his recorded activities of daily living. And she also noted that Mr. Runte made a statement that he recorded in his own notes about reassuring Mr. Cawley that he could stay in disability as long as he needed to, which she believed was a statement that he was not making that decision based on medical issues, but on some other reason, trying to comfort his patient. So, I mean, those seem like pretty specific and convincing reasons to reject treating doctors. Was she supposed to say more? What more did she need to say? Well, these reasons, they may have been specific, but it's our position that they were not legitimate because, first of all, well, for example, the activities of daily living that the ALJ said were inconsistent with the doctor's opinions. These are not activities that he's able to engage in on a regular and continuing basis all day long. They're not actually inconsistent. His ability to go on a cruise for four days, for example, with help from his family, and his wife says that he slept the entire time. He said, I mean, just to get to a more granular level and be a little more specific, he said he was dizzy, he didn't have balance, he couldn't walk without holding onto a wall, things of that nature. But meanwhile, he also reported walking a mile, a mile and a half to get the mail, working out with a trainer at the gym, although he then later said he only did that seven times, traveling long distances, setting aside the cruise, but, I mean, traveling with his family. I mean, he did things that didn't seem consistent with the level and the severity that he was claiming of his symptoms. Is there a reason why that's wrong? Well, even his doctors noted that he was able to do some activity. He could stand or walk for about two hours in a day, sit up for about two hours in a day, but he was not able to sustain that level of activity, concentration, and persistence for a full eight-hour day and a full 40-hour work week, which is what's required for full-time work. If he cannot, if he can do some activity, but he can't sustain it on a full-time basis, then he is disabled under the law. Okay, so if we, there were multiple reasons. Do, if we discount one of them, can, does that mean we have to discount all of the ALJ's opinion, or if one opinion is sufficient, one reason, I should say, suffices, is that, is that enough? Well, that's for the court to weigh whether the totality of the ALJ's reasons were sufficient. Okay, your time is up. Thank you very much. Mr. Howell. Thank you, your honors, and may it please the court, Daniel Talbert for the Commissioner of Shepard have discussed so far. This is a case that's basically about a claimant who had headaches that resulted in a brief hospitalization in April of 2013, but after that period in the months and years following, the claimant made very good recovery and showed normal functioning on treatment notes and examination notes. He had normal memory, normal coordination, normal concentration, normal balance, normal speech, etc. Despite those alleged that he couldn't work because of poor memory, poor concentration, confusion, etc., all of which conflicted with those normal examination findings. Because the record didn't substantiate his allegations, the administrative law judge reasonably rejected those allegations and relied on the opinions of the five medical sources who opined that he had only mild at most, mild at most limitations and therefore no severe impairments. And for that reason, we ask the court to affirm the ALJ's decision. To address a couple of the- What was his job before? His job? I think he was doing hardware sales. I think that was his, he had done that brief for a couple of years before the time of his hospitalization. So, Mr. Talbert, you argued in your brief that Mr. Cawley's position is asking us to reweigh the evidence. Ms. Sheppard says, no, that's not the case. So, how do we figure that out? Who's right in this? I mean, I know you're going to tell me you're right, of course, but I mean, why? I mean, why isn't she correct? Yes, Your Honor. So, the issue here is that when we have conflicting opinions and conflicting, well, yeah, when we have conflicting opinions from different doctors, yes. We have conflicting opinions between two treating doctors and a consulting doctor on the one hand and non-treating and reviewing doctors on the other. Is that right? Yes, Your Honor. That's right. There's the two treating doctors and then there's the five other doctors, one examining and four- Right. I thought he had an issue. Then, Dr. Beebe, I think that he, his neurological examination was normal, but he said it may take up to one point. Then he had another neurological examination who said he had mild cognitive residuals. And then he had, Sakamori had another neurological consult, who said he had persistent mental and physical fatigue, slow processing and other symptoms. So, who is it who said that he had no, nothing significant? That would be Dr. Portnoff, who examined the claimant. Let me take a look at the, find exactly where the citation is. I think it's ER 410. Thank you, Judge. Yes, that's Dr. Portnoff, who was the examining psychologist. There's also Dr., the state agency doctor is Dr. Boettcher, that's ER 68. There's also state agency psychologist, Dr. Billick, looks like his opinion is at ER 68 as well, maybe 69. State agency physician, Dr. Frye on page ER 82, state agency psychologist- All of these people are people who didn't actually examine him, except the first- Judge Berzon, I couldn't hear your question, are all the people that you're now reciting, people who did not actually examine him? Four of them were, Your Honor. There was one that examined him and four that did not. So, that's the five- One that examined him was not a doctor? Yes, he was a psychologist, Your Honor. Right. So, had no expertise in meningitis or perhaps meningitis. Is your position that he didn't have meningitis or what? My position, Your Honor? Our position, no, we're not- Is it that he never had meningitis in the first place or that that doesn't matter? I think respectfully, I think respectfully, it's more along the lines of it doesn't matter in this case. I mean, it matters in so far as the lack of any confirmation or verification of diagnosis is, I think, consistent with the overall picture of the record, which is that there's really no evidence that there's anything particularly wrong with this individual. But the ALJ still evaluates it, evaluates the case based on the symptoms that he's alleging and what the treatment notes actually do show and what they show- What does a history of no encephalitis mean? What does it mean? It means that he had that condition in the past. The condition being what we would call encephalitis or something else? Being, I guess, the meningoencephalitis. Which is- I'm sorry to be ignorant, but I don't understand if there's a difference between encephalitis and meningoencephalitis. I will admit, Your Honor, I don't know the exact distinction either. I think I would retreat back to the- I think it's pretty important because the ALJ found that he did have meningoencephalitis, whatever that is, and would therefore have resolved any- If that means he actually had a disease of encephalitis, then that was resolved in the facts. Well, Your Honor, for our purposes, and I don't mean to argue or dispute things, but for our purposes, I would submit that the exact diagnosis isn't going to be significant here for a few reasons. The first one is that the claimant hasn't challenged that or alleged that the ALJ is looking at the wrong standard or the wrong kind of evidence based on what condition he had. But the other point I want to make is just the Matthews versus Shalala point, which was where this court said that a diagnosis of a condition does not establish disability. I mean, it's whatever the condition is, there's various diagnoses that can cause various- But it's relevant because medical doctors, they can diagnose it, have some idea of what course of it would be, right? That's true, that's true. They know that it takes, or they project that it takes a wide amount of time to get better from it. Well, Your Honor, I mean, yeah, that's, I think that can be the case. That can certainly be the case that doctors can have those prognoses or expectations. Our point in this case is that the treatment notes consistently and routinely show that the claimant was doing very well. His findings were always entirely normal. Sometimes there were mild abnormalities, but again, mild is consistent with a non-severe impairment. So our position is that under the substantial evidence standard that we're reviewing, or this court is reviewing here, when it looks at was the ALJ's reading of the record and of the evidence and resolution of conflicts in the evidence a reasonable one, our position is that it was eminently reasonable. It was entirely reasonable to conclude that with this evidence that showed that the claimant kept saying, well, I have bad memory, I'm confused, I have bad balance, but the doctors are consistently finding that all of that is normal. It was reasonable for the ALJ to say, yes, I'm rejecting those symptom allegations. I wanted to make a quick point about some issues of certain standards that are, that are at issue here. I know there was, there was a question about the ALJ needed to give clear and convincing or specific and legitimate reasons for rejecting the treating sources. This court decided definitively about a year ago in Ford versus Saul that the specific and legitimate standard applies in a situation like this. In Ford versus Saul, this court said that the opinions of non-examining doctors that conflict with a treating source give rise to the specific and legitimate standard. So the door is closed on that. That's been decided. The, the issues of other standards that we talked about a little bit here. I think there was actually, I was, I think that was the key point I wanted to make there. So I see that I'm running to my, about my last minute. So I'll just see if the panel has any specific questions. I do have a question counsel. I have a question if I could, prompted by something that you just said a minute ago, not even a minute ago, which is that he complained of various symptoms and that his treatment notes show that that's normal. And I don't know if you mean normal as in, if you had this episode of meningitis that it's normal that it takes a year to get well and to recover, or do you mean that if he had those very same symptoms on a permanent basis, you know, for more than a year out that they wouldn't rise to the level of being a severe impairment, you know, severe meaning significantly limits an individual's ability to perform basic work activities? Yes, your honor. The, the, the second point that those findings were normal for anybody that was not just normal. So it wouldn't, even if normal, even if he was reporting them two years out, they wouldn't rise to the level of a severe impairment within the meaning of the act. Is that fair? The, the, the treatment note objective findings. Yes, that's correct. Thank you. So looking at one last question, looking at the court off PhD, he's the psychologist. Yes, your honor. And he says he's able to manage funds capable of simple tasks, mild limits in detail, complex tasks, accepting instructions, interacting, working consistently, maintaining regular assist, attendance, completing a normal work day and dealing with stress. So he at stage two, a demonstration that he has more than minimal, I don't, unless mild is somehow defined as something other than he has all these limitations. Yes, your honor. It's, it's exactly as your honor said, it's because they're mild. And that's, you know, that's when we're looking at the world of non-severe impairments, mild is kind of a term and it's actually defined in part of the regulations. I could cite that if the court's interested, but, but in discussing what's a non-severe mental impairment, but most importantly, I would note that Dr. Billick, who is the state agency psychologist who evaluated the record at the, I think the initial stage. And then there's also another one at the reconsideration stage. They both assigned significant weight to Dr. Portnoff's conclusions. And they said, yes, we're agreeing with Dr. Portnoff who said mild and all of these areas. And the conclusion is that it's a non-severe, non-severe impairment. So those doctors are experts in social security disability programs. They understand what, what it means when there's mild limitations in these, these domains, and that's consistent with a non-severe impairment. So that's, that's, that's essentially the point there. Okay. Thank you. Your time is up.  Okay. I would just like to draw the court's attention to page 16 of our opening brief where the Rodriguez case discusses that the subjective aspects of a treating doctor's opinion are also an important consideration. And that even if the purely objective evidence doesn't necessarily support the extent of the limitations, the doctor described that these subjective aspects are something that the ALJ also needs to consider. You agree that it was legitimate for the ALJ to consider Dr. Ronte's comment in his notes that he had told Mr. Colley he could stay on disability as long as he needed to. I mean, could she, could she consider that? And could she draw negative inferences from that? You could consider it, but it's our position that both the fact that he wasn't subjectively ready to go back to work and his doctor also believed that he wasn't objectively ready to go back to work. Both of those things can be true. And I don't understand that statement is that he would have, he would be on disability as long as he needed to, not as long as he wanted to. Right. Well, it can be interpreted in that manner also, I suppose. Well, why would you interpret needed to mean wanted? Well, I wouldn't. I thought you said needed, isn't it? What do you think? I believe that's what he said. Okay. Your time is up. Thank you for your argument. As I said, the next case Rosa Pivicks versus Rosen is submitted by the briefs and we'll go to Aguero versus Udo.
judges: Berzon, Christen, Bade